RAE A. CLARK and REBA WILSON, Administratrices of the Estate of THENIA D. ALLEN, Deceased, Respondents, v. LINWOOD HOTEL, Inc., Appellant, No. 44860—291 S. W. (2d) 102.

Division One, May 14, 1956.

Motion for Rehearing or to Transfer to Banc Overruled, June 11, 1956.

*Clyde J. Linde, Robert B. Langworthy* and *Billy S. Sparks* for appellant; *Langworthy, Matz & Linde* of counsel.

*A. E. Margolin, F. Philip Kirwan* and *Harold H. Croghan* for respondents; *Margolin & Kirwan* of counsel.

[103] HOLLINGSWORTH, J.—Mrs. Thenia D. Allen was injured as she attempted to alight from an automatically operated passenger elevator maintained by defendant in its apartment hotel. Her petition, predicated on the doctrine of res ipsa loquitur, alleged that as a direct result of negligence of defendant the elevator suddenly moved upward as she attempted to leave it, which caused her to fall and sustain grave personal injuries, for which she asked damages in the sum of $50,000. Prior to trial, Mrs. Allen died of a cause not attributable to her injuries. Two of her daughters, Rae A. Clark and Reba Wilson, were appointed as co-administratrices of her estate and as such, upon motion, were substituted in her stead. Upon trial, the jury returned a verdict for defendant. Plaintiffs' motion for new trial was sustained on the ground the trial court had erred in giving defendant's Instruction No. 6, submitting an issue of Mrs. Allen's contributory negligence. Defendant has appealed from that order as being erroneous and also asserts that Mrs. Allen's injuries "occurred notwithstanding the exercise of due care by defendant and res ipsa loquitur does not apply".

The Cornell Hotel, operated by defendant, has six floors and is equipped with the passenger elevator in question. Mrs. Allen resided on the fourth floor and had been a resident tenant of the hotel about twelve years. The elevator had been manually operated until 1947, at which time it was converted to an automatic or semi-automatic type by the defendant owner. The power machinery that controls the hoisting, lowering and stopping of the cage is in a penthouse atop the hotel. The cables from which the cage is suspended are not within the view of passengers. An interlocking system, consisting of seven interlocks, performs an important function in the elevator's operation. One of these interlocks is in the cage and one is at the door of each of the six floors. Each of these is enclosed in a box or cover. All of the aforesaid equipment is in the exclusive control of defendant. The elevator has no levelling equipment and does not always stop exactly at floor level; it may [104] stop two or three inches above or below the floor. Mrs. Allen operated it frequently after the change over. She knew it was electrically operated by the use of push buttons and the extent to which it usually functioned when operated by such

buttons, but was otherwise totally ignorant of its mechanism. The elevator is inspected monthly by the Rafiner Elevator Works. A regular inspection had been made on the morning of the day on which Mrs. Allen was later injured. The report made on this inspection showed the elevator to be in good condition. It was again inspected by the same inspection service on that day and within an hour after Mrs. Allen was injured and again reported in good condition. The inspectors who made the foregoing reports testified as to the extent of their respective examinations; that their reports correctly stated the result of their inspections; and that the elevator would not operate with the doors open, either before or after Mrs. Allen was injured.

Mrs. Allen's deposition was read in evidence by plaintiffs. She testified: To go by elevator from the fourth floor to the first floor, a button is pushed; the elevator comes to the fourth floor; the outside door is pushed open by the passenger, who then pushes open an inside lattice door (affixed to the cage) and enters. Both doors are closed and a button in the cage is pushed for the floor desired. The elevator moves automatically to the first floor. When it reaches the first floor, the passenger pulls the lattice door open and then pulls open the outside door. On all of the floors except the first floor, both doors close when released. On the first floor the outside door can be pushed back until it catches and holds, stays open.

At about one o'clock, p.m., on the day she was injured, Mrs. Allen was advised there was a package for her at the desk on the first floor. "I went down to the elevator and pushed the button, got in the elevator, closed the doors and then pushed the inside button for the first floor. The elevator went down to the first floor and stopped. I pulled back the inside door, pushed the outside door back until it clicked or stayed, then just as I was ready to step out of the elevator into the lobby, just like that (indicating), it jumped, the why or wherefore I don't know. * * * * [J]ust as I was stepping out or ready to step out, the elevator gave a lurch like that (indicating) and, of course, it threw me straight out into the lobby floor. * * * * Just ready to step, as I thought, on the level with the floor, step from the elevator to the floor before anything could occur, and it just gave that lurch * * * it threw me practically into space, you know. It just threw me out because it was right under my feet and I wasn't expecting it. * * * *"

When asked if she could remember with any particularity just what happened prior to the time the elevator lurched, she answered: "No, you don't observe things, you didn't expect anything. It is something you did divers times during the day. You are not looking for accidents or things to occur." She knew that it did not always stop level with the floor. "Q. Now, before it jumped, do you know whether it was level with the first floor, whether the floor of cage was level with

the first floor? A. Well, I couldn't say it was just accurate but it evidently was level enough that I thought I could step out of it."

In response to a question as to whether or not the stop which the elevator made at the first floor appeared to her to be normal, she stated: "Well, truthfully speaking, you give it so little consideration about anything being unusual, you get in the elevator, ride to the floor, it stops; you make the necessary procedure to hold back your doors and step out, all of which was correct and just as I was ready to step out, that elevator jumped—there is no question about that, it did it for some reason that I wouldn't know."

A duly qualified expert, in response to a hypothetical question propounded by plaintiffs' counsel, in which he outlined the mechanical structure and method of operation of the elevator as described by defendant's witnesses, stated that in his opinion "it would be possible for this elevator to lurch or jump six or eight inches with both the elevator car gate and the lobby door open."

The doctrine of res ipsa loquitur applies only "when (a) the occurrence resulting [105] in injury was such as does not ordinarily happen if those in charge use due care; (b) the instrumentalities involved were under the management and control of the defendant; (c) and the defendant possesses superior knowledge or means of information as to the cause of the occurrence." McCloskey v. Koplar, 329 Mo. 527, 46 S.W. 2d 557, 559, 92 A.L.R. 641. It frequently has been held and we have no hesitancy in again holding that a sudden and unusual movement of an elevator, the instrumentalities of which are under the exclusive control of defendant, warrants an inference of some negligence on the part of defendant. Stroud v. Booth Cold Storage Co., Mo.App., 285 S.W. 165, 166; Meade v. Missouri Water & Steam Supply Co., 318 Mo. 350, 300 S.W. 515; Bartlett v. Pontiac Realty Co., 224 Mo.App. 1234, 31 S.W. 2d 279, 280; Warner v. Terminal R. Ass'n of St. Louis, 363 Mo. 1082, 257 S.W. 2d 75, 79-80.

But defendant says its evidence of inspections made by qualified experts both shortly before and shortly after Mrs. Allen was injured, in the reports of which defendant was assured the elevator was in good condition, shows that defendant exercised all possible precautions; was therefore guilty of no want of care in the performance of its duty, and cannot be held liable. In so asserting, defendant misconceives the true meaning and extent of the res ipsa loquitur doctrine. A prima facie showing of negligence under that doctrine raises a substantial factual inference of defendant's negligence which amounts to evidence, as distinguished from a mere procedural presumption, that does not disappear upon the submission of evidence tending to exculpate defendant, but remains in the case as evidence sufficient to support an affirmative finding for plaintiff. Harke v. Haase, 335 Mo. 1104, 75 S.W. 2d 1001, 1003; Turner v. Missouri-Kansas-Texas R. Co., 346 Mo. 28, 142 S.W. 2d 455, 460; Whitaker v. Pitcairn, 351 Mo.

848, 174 S.W. 2d 163, 169; Maxie v. Gulf, M. & O. R. Co., 356 Mo. 633, 202 S.W. 2d 904, 911; Bartlett v. Pontiac Realty Co., 224 Mo. App. 1234, 31 S.W. 2d 279, 281; Duncker v. St. Louis Pub. Service Co., Mo.App., 241 S.W. 2d 64, 67; Conser v. Atchison, T. & S. F. Ry. Co., Mo.Sup., 266 S.W. 2d 587, 590.

Defendant also contends that inasmuch as Mrs. Allen was operating the controls (the push buttons and the doors) at the time she was injured, defendant was not in exclusive control of the elevator and is therefore not liable under the res ipsa loquitur doctrine. The argument is not realistic. Mrs. Allen had no control over the elevator other than to attempt to cause it to function in a certain manner; she had neither control nor knowledge of the method of control of the mechanical forces that came into play when she had pushed the button by which the elevator started its descent to the first floor, or when she opened the exit doors upon arrival at the first floor. These mechanical forces were hidden from her and were exclusively under the control of defendant. Once they started to function in a manner other than that for which they were intended, she was helpless; and, as we have hereinabove held, a movement of the elevator brought about by an erratic operation of these forces, to wit: the upward lurch after the elevator had stopped, would be so unusual as to warrant an inference of some negligence on the part of defendant. We hold that a submissible case of negligence under the res ipsa loquitur doctrine was made against defendant. See Cruce v. Gulf, M. & O. R. Co., 358 Mo. 589, 216 S.W. 2d 78, 80.

Instruction No. 6, given at the request of defendant, and upon which the trial court sustained plaintiffs' motion for new trial, directed a finding for defendant "if you believe and find from the evidence that [Mrs. Allen] did not watch her step as she alighted from the elevator and * * * that she thereby failed to use ordinary care * * *, and that such failure * * *, if so, directly contributed to her fall", etc. Defendant says that Mrs. Allen did not observe and did not know whether the elevator was level with the first floor when she attempted to step from it and that such evidence justified submission of contributory negligence on her part, as hypothesized in Instruction No. 6.

[106] In support of its contention, defendant relies strongly upon the case of Ross v. Sisters of Charity, etc., 141 La. 601, 75 So. 425, as being "squarely in point". In that case, plaintiff entered an automatic elevator and pushed a button to descend to the first floor. Upon arrival, she *thought* it had stopped and undertook to leave, but *her witness* "said very positively that the elevator did not stop at the first floor". The court then disposed of the case in this manner, loc.cit., 426: "It therefore appears that the plaintiff, who desired to stop at the office floor, and who had arrived at that floor, thought that the elevator came to a stop, and undertook to open the door and leave the

elevator while it, the elevator, was still in motion. In so doing she stood on a ledge, or sill, which was stationary; and the descending elevator caught and crushed her, very severely injuring her. As the elevator did not stop at the office floor, when plaintiff desired to leave it, she should have remained in the elevator, which was a perfectly safe and sane thing to have done until it did stop. * * * *''

The case is similar to the instant case only in that it involves an automatic elevator and a passenger seeking to operate it so as to enable her to alight at the first floor. The only evidence in the instant case as to the movements of the elevator and the action of Mrs. Allen is that given in her deposition, as above set forth. Her testimony was that the elevator came to a stop and so remained until she had opened the lattice door, pushed the outer door open until it ''clicked'' or ''stayed'', and attempted to alight by starting to step from the elevator; a step she never took, because, before she could do so, the elevator suddenly lurched upward and threw her from it. So, even if it be assumed that Mrs. Allen was guilty of negligence in not observing whether the elevator was at the level of the first floor when she started to step from it (there was no evidence that it was not in fact at such level while it remained stopped—which, of itself, would leave unanswered the question of her alleged negligence being a proximate cause of her injuries), yet, according to her testimony, the upward lurch of the elevator interrupted and made impossible the taking of any voluntary action on her part, which, if taken, could have convicted her of negligence. Her testimony, therefore, negatives contributory negligence as a proximate cause of her injuries. Consequently, there was no evidence upon which to base Instruction No. 6. The court did not err in sustaining the motion for new trial. Gleason v. Texas Co., Mo.Sup., 46 S.W. 2d 546, 547; Pearrow v. Thompson, 343 Mo. 490, 121 S.W. 2d 811, 815; Thompson v. Byers Transportation. Co., 362 Mo. 42, 239 S.W. 2d 498.

The order of the trial court granting a new trial is affirmed and the cause is remanded. All concur.